N15156. A, P2003 D, Hospira, Inc., V. S. v. Int., H-AL-D, Gulf of Mexico Supervisory Bureau, P-A-R-T 2003-1, Hospira. Thank you very much for working your time out. We do appreciate that. And I will try to remember where we are because when we go back and forth, I tend to forget. All right. And Mr. Eaton, if you are ready, you may proceed. Good morning. My name is Tim Eaton, and I represent the defendant, Hospira. Your Honors, this case involves the discharge of a former Hospira employee who was terminated because of a failure of leadership in leading his quality and compliance group in response to an audit, when certain materials were withheld in violation of a specific provision of the Hospira Code of Business Conduct. Respectfully, his termination was not in violation of a clearly mandated public policy based upon an unrelated issue. Also importantly, Plaintiff's defamation claims are entirely premised on the alleged retaliation charge because otherwise both defamation claims would be true and not actionable. He was fired based upon the audit when information was withheld, again in violation of the code. It is also important to note at the outset that the damages which were alleged at trial, which resulted initially in the $10 million verdict, were largely based upon an emotional reaction to the discharge that related to both counts, nothing separate and distinct. A truth evidenced by the fact that within a couple months, the plaintiff was doing consulting work. Within six months, he had a full-time job making just slightly less than when he was making at Hospira, and eventually more. Counsel, with respect to the public policy issue, you rely on Turner v. Memorial Medical Center for the proposition that Plaintiff's public policy of patient safety was too broad and too general to constitute a clearly mandated public policy. But here, unlike in Turner, don't the regulations identified by Plaintiff, I believe 806 and 803, relate directly to the reporting requirements that he alleged Hospira violated? They do relate to reporting requirements of the FDA, and your Honor, there was evidence in the record that in 2010, shortly after Hospira became aware, I believe in June of 2010, of the issue with the Spanish Hospital, they did file, I think it's Exhibit 13 in the record, a report to the FDA regarding what had occurred. However, again in 2011, there was a report again made. So I think it was established that the reporting requirements were done. What the plaintiff was trying to make hay out of was that Mr. Estrada and another employee, Ms. Nelson, had suggested that there should be a recall. So the facts didn't really relate to the reporting requirements because the reporting requirements were met. What the public policy issue here, and we would ask this Court to consider it as a matter of law. We're not going to get into who said what. But as this Court is well aware, from the very beginning, this State has had a common law policy of at-will employment where you can fire anybody for any reason or no reason. There was an exception made early on in Kelsey v. Motorola where there had been a worker's stop claim filed and then there was a discharge. That was a clear mandated policy. What we have here is a situation where, with respect to this plum pump, which is part of the State Fire Times, we have a situation where there are air bubbles in the distal end of the wire going into it. But weren't they required then to correct that? And didn't 806 require HUD-CERA to report corrections or removals that were initiated to remove that risk? And isn't that part of the public policy regarding? Your Honor, if it were clear cut, like in other retaliatory discharge cases, I would agree with you. For example, there have been cases that have dealt with misbranded food where it was obvious that they should have done it. A worker's compensation complaint, it's obvious they should have done it. What we have here is testimony by Mr. Dubois at trial that 30 people reviewed the report that was sent in to the FDA, I believe it was September 12, 2011, where they said that the use of the pump was acceptable with justification. Now, Mr. Estrada disagreed with that. And so did Ms. Nelson. So did Ms. Nelson. And they felt that the statistics that were in the report, correct me if I'm wrong, were inaccurate because they lumped together the use of the pump on others and to use a phrase. Based on that, they thought the pump should be pulled from the market. Yes, they did. And so the issue is, Your Honor, when you have a difference of opinion within a company as to what should be done, and a report is sent that's backed by, I think the word was, consensus, is that a public policy that is going to trigger a retaliatory discharge because someone disagrees? At what point, if you have ten people and you have two people that say, we think there should be recall, and you have eight people that say you shouldn't, or four and six, where do you draw that line? It's not a clearly mandated policy. Hospira disagreed with Ms. Nelson. But they still had the right, Ms. Nelson and Mr. Estrada had the right to object and to make that objection public. Absolutely. And when they did, it just so happened something else was going on that Hospira was able to use as a justification. So now we have two issues that are before a jury. Yes. And they had to make a decision based upon credibility. And it would appear that they did not believe Hospira. But, Your Honor, as a man, the public policy is going to be determined by this court as a matter of law, whether or not this court is going to say there's an exception. And what I'm arguing is, as a matter of law, this court should not say that where there is a divided opinion among engineers at Hospira as to whether or not there should be a recall, that somehow then that is going to protect those employees in the minority from ever being discharged for any reason. So what does plaintiff require to do beyond identifying these two sections, 803 and 806 of the CFR? I think you're right. To establish this public policy? Your Honor, I don't believe there's a public policy here. And I don't think plaintiff could establish it. If this had been a workers' comp case, if this had been something where there was a clearly mandated policy to label food, if this had been a public policy that workers are to give X amount of minutes off for lunchtime and they say abuse that policy. But here, you have an issue of whether or not this court is going to impose as a clearly mandated public policy that when there's a disagreement about whether or not a product should be recalled from the market, that somehow that's clearly mandated and you have to do it even if the other engineers disagree with themselves. But that doesn't show that Hospiro was required to correct this errand line issue either by recalling the product or changing the operating manual and that it had a duty to report those steps to the FDA under 806. And it did. Did it make any changes? No. They sent a report back to the hospital, and I believe that was August 30th of 2011, where they expressed what was going on, what could be done to prevent the bubble, what the situation was. And that was a report which, by the way, Mr. Estrada was sent and asked if he had any objections to. He did not object. It was sent to the hospital. They did make some recommendation that would address the issue that the hospital was concerned about. Yes. Was that ever reported to the FDA under the regulation? In 2010 and in 2011, Hospiro filed reports to the FDA saying here's what the hospital has reported, here's what we respond with, and here's the issue. And we believe that because of the benefit of using this pump, particularly even with infants, that it's acceptable risk with justification. In his email to the CEO, did Mr. Estrada comment at all upon inaccuracies in the communication to the hospital? No, he did not. If you read the email, Your Honor, what it says was he was complaining about the complaint process. He was up to no good. Not the result. He was complaining about the process. Correct. That's correct. He was prohibited, excuse me, he was prohibited really from using, it was understood he couldn't really use the word recall. Isn't that correct? So that just in that sense his complaints were code, if you will, for a recall action that needed to be taken. There was some testimony as to that. But the language, typically you do not use the word recall when you're complaining about a product defect. But here, if you look at what he said in this email, this email was solely addressed to his point, why did it take us a year to respond to this hospital? Now, by the way, at that hospital that pump was not being used after they had initially reported it. So Hospiro did take a year. But the question then becomes, is this internal process of responding to a complaint a clearly mandated public policy that this court is going to say, well, you don't have a good complaint process, then that's a clearly mandated public policy that's going to protect an employee who reports it. Well, I have another question. Apparently they were willing once all of these things started to break with the fatigue pump, they decided they would then set up a CAPA to investigate the investigation. Did they ever set up, I'll call it a CAPA for lack, I don't want to say the letters all the time, did they ever set up a CAPA on the plumb pump when the Spanish hospital complained? Your Honor, I believe there's testimony in the record that they did. There's not much in there about it, but obviously the focus of the CAPA was on the one pump that you mentioned with respect to the white screen. But they did reach a conclusion internally that the use of the pump, the plumb pump, was acceptable with justification. And, again, what I'm concerned about and I think what the court should be concerned about is if they say that's a condominium of public policy and you have decision makers within that say, we think it's justified, now you're going to have 12 lay jurors to weigh in on, well, we don't think it was justified. You should have done something about it. You should have taken it off the market. You should have recalled it. Do we want to give jurors that authority? Now, when you file a corpus health claim, that's clear. But the exception we want to make here is that there's a disagreement and you don't go along with what was actually consensus not to do it. You're exposing yourself to damages like here if that employee gets discharged for another reason. What was the evidence regarding what the CFRs actually required? Were copies offered into evidence? And these are regulations with subparts. They are. And they're voluminous, 803 and 806. How was that presented to the jury? Your Honor, I believe the answer is there were two witnesses who testified regarding 806, Christine Rapp, who was the Office of Ethics Compliance, and then also Ms. Nelson referred to 806 to reporting requirements. But were those ever given to the jury to determine whether or not they were filed or not? No. I read them and they're very good. My point is that whose burden is it to show that there's a clearly mandated public policy? It's the plaintiffs. It's absolutely the plaintiffs. We've got a lot of issues to cover. I think we've thoroughly covered this one. We appreciate your arguments on this. With respect to the defamation, per se, claims specifically with the code of the COVC, the business code, what was the spirit of purpose in making this motion and limiting number two? Because in, I think it was paragraph 63 of the Third Amendment complaint, was this broad statement that Hot Spirit, it didn't indicate who, had violated a company policy. And it was not specific. The discovery had closed. It was on the eve of trial. And they said, look, there are two claims at that point, the fatality claim dealing with the letters of e-mail he had sent, and that was tossed at the end as destructive burden. And there was also the second one dealing with the head for a role of combat by Mr. Dubois. They were trying to use this kind of catch-all paragraph, and it was very unspecific. And so the motion limiting was strictly related to the defamation claim, which was to basically not allow evidence in on that. And that motion was granted. But now, it did not refer, that motion really didn't refer to Mr. Dubois' statement. It did not. No. Okay. It did not. Except perhaps in a footnote, there was some casual mention. Go ahead. By the way, they were aware of the fact that Dubois had had this meeting following, because he had a deposition, following Estrada's termination. And they could have made it more specific, and they did not. And that was the concern that the trials rejected. So we thought we had a safe harbor when Dubois testified in a trial about, why did you discharge him? And he said, I made the statement for CBOC that related to retaliatory discharge. It did not relate to defamation, because we thought that was out until the end, when there was a reversal of that motion limiting. But you knew that this was an interlocutory order that the court could always change, correct? And there were references all the way along to this Dubois statement. So how could you, in essence, rest on your laurels and not object or not ask for a limiting instruction and expect the benefit of the court's ruling without taking these additional precautions? The question not answered. If that testimony had come in without objection relating to the defamation claim, you'd be absolutely right. It was being used solely for the retaliatory discharge. And I don't know why, at that point, we would want the jury instructed in the limiting instruction, oh, by the way, that's not defamation. It didn't make any sense in the context of the way that evidence came in to raise an objection, because what we were trying to do is prove this is why he was discharged. It was because he violated a few years here. So you were trying to disprove the pretextual argument of the plaintiff, is that correct? Yes, absolutely. So that's why we didn't object. And then when the court reversed itself, after the evidence had closed, after the evidence had closed, we did not have the opportunity then to go back and put on evidence the qualified privilege, for example. But you didn't ask for that, to reopen the evidence, did you? No. Or conduct further discovery then? Evidence was closed, right? Well, I mean, we all know during a trial you can ask to reopen. Sure, you can. But, Your Honor, at that point, we were at the end of the trial. We had gone into that trial on the premise that there were only two allegations related to defamation. The case had been heard. And honestly, I think this court should be careful about saying that if this is granted, that you ought to be able to go back and reopen the case and have the jury hear new evidence. Because this is, although it's been analogized to an amendment, it really, and usually amendments are allowed then to conform to the proof. Correct. But in this case, it was something that you couldn't conform to the proof because there hadn't really been an opportunity for us to find proof that related to a defense, which is why didn't we tell these direct reports? And by the way, I know I haven't had any damages at all, and I probably wouldn't have had the opportunity to address that in the development that is going to be an issue. But we had a meeting, Dubois did, with six people that were his direct reports, and said, your boss was terminated. It wasn't like you were trying to put out this publication to the world on TV or through newspapers or whatever. It was a direct report. Your boss was terminated because he violated the CBOC, which is a very important document. So what additional discovery would have been necessary? I mean, how to one plus fear of prejudice? If Dubois had been able to say, here's why this is important, and we were going to have the direct reports testify, we needed to know, we needed to know why. I mean, Plank was suggesting that we should just say he was terminated, period. But when you're in a workplace, you can't just say, by the way, we terminated your boss. It's unwarranted speculation. It could destroy morale. Yes, because it works. Or it could have been sexual misconduct they may have been thinking about. Well, no. It was because there's a code of business conduct, and it was not foul. Well, understanding, and I mentioned this before, that you have this convergence of slum punk and sympathique almost at the same time. Yes. There had to be, in the minds of the company, the idea that we've got to prove this, but we also have to disprove the defamation issue. And there was no strategy in place for that other than we just thought. We relied on it, even though that order was clearly interlocutory. Well, it was totally interlocutory, but at this point, when the evidence comes in for another purpose, and not for the purpose in which you filed your motion eliminating, the purpose of the motion eliminating was to keep it out as a defamation claim. That was granted. It came in for another reason. It was brought up originally by plaintiffs without objection. I acknowledge that. And, by the way, the court says the trial court extended testimony. No, it was less than two pages. I went back and counted the lines in terms of how often that was brought up. There was very little testimony about the fact that he had said that. I'm sorry. I'm sorry. I'm just letting you finish. But, actually, this motion eliminating wasn't with respect to this Dubois statement. It was with respect to other statements outside of what was alleged in paragraph 63. It was the concern that, your Honor, the concern was that paragraph 63 was going to be this catch-all that would allow anything in. But, with respect to the specific Dubois statement, I'm heading to a role that was already in as a count. That was part of it. But, with respect to the report on the CBOC, no, it wasn't. That wasn't excluded. It was not. And it was not to be. It was expected at that point that it was not going to come in. So, you know, to be second-guessing trial count was a strategy at the end. You should have reeled it up when it came. It was a complete surprise that the judge was going to allow this. It was very prestigious. And I think it had an impact because it gave them the opportunity to look at it. Because we would say quickly, head to a role is not defamatory per se, absent extrinsic evidence, and they're trying to rely on what happened the next day. And you can't rely on extrinsic evidence in the future. Okay. Well, what about at the time that the judge reversed himself? Yes. There were still instruction possibilities and there were still argument possibilities. Now, there isn't going to be an IPI on this particular issue. Was anything submitted to try to deal with this as an instruction, whether it was accepted or not accepted? The pattern of instructions with respect to defamation that a spirit attended only had the one claim, his or her. So there was an instruction that was rejected because now they added two. There was also argument by the plaintiff in their brief. Well, you didn't object then to the instruction that had both. And the judge Ortiz, in his opinion, very lengthy opinion, said, I don't see that as a waiver because we had just argued that and we'd gone back and forth and back and forth. I swear his objection to that was clear. On the issue of the qualified privilege, there had been a plaintiff's instruction that included that, originally because of the fatality situation. And that was removed. And then the question became, well, do you want it back in because of the CBOC thing? And trial counsel made the decision on the spot, no, because I hadn't been able to establish the facts that relate to that privilege, so therefore I don't want it back in. That didn't mean that she was withdrawing her objection to the fact that it was added, but she said, I don't have the proof. And I'm not asking you to pen an instruction for me now, but under the circumstances, when you're surprised, there was nothing that, we're not going to get an IPR. It's not going to happen for this problem. I'm getting it. There was nothing that was contemplated to be given to the jury to help them to separate the issues, because that's the issue here. No, other than the fact that, again, we tendered the proper instruction, we believe, which only allowed one claim. And as to the procedural morass that we were in at that point, no. There was nothing more that I believe could be done. You will have other opportunities. All right, thank you. Good morning, Your Honor. Good morning. Essentially, this appeal and cross-appeal boils down to two issues, liability and damages. As to the question of liability, this is really dependent on the state's debate at the apple. There were two motions to dismiss, a motion for summary judgment, a five-day jury trial, a post-trial motion, and now this appeal. In every prior instance, it was found that it was properly planned and proved both defamation per se and retaliatory discharge. With regard to retaliatory discharge, my question is earlier about where is the evidence of a clearly mandated public policy? Where is the evidence? And why not offer the copies of the CFR that's relevant to establish clearly mandated public policy rather than just rely on it? In answering that, if you could also respond to counsel's argument that there was no public policy here, so articulate what is the clearly mandated public policy. So as pointed out by this Court, CFRs 803 and 806 do require health care to notify. It was required to notify the FDA that if instruction previewed, needed to warn hospitals not to use this pump on infants and children. Mr. DuBois, the head of the entire quality compliance department. You say that. That was the testimony that? Actually, Mr. DuBois understood that both Ms. Nelson and Mr. Estrada were saying, we need to have a recall here. He testified. He did understand that, but he said health care didn't want to do anything because no one had been injured yet. That was the testimony at trial. So why would we need to? Because it's an element of the cause of action. That's why you have to prove it. I'm sorry. What was the specific testimony as to the clearly mandated public policy? Well, I believe that the standard is that the plaintiff has to have a good faith belief that the defendant is violating the clearly mandated public policy, not that we have to prove what exactly the entire detail law says. But Ms. Nelson testified that when you know about a risk to a specific group of people, you are required by these regulations, 803 and 806, to issue a recall. Now, a recall is a very broad word in the industry. It includes a customer notification. It includes actually changing instructions for use. But it definitely requires that you notify the FDA that you're aware of this risk. And that's what was being asked. And respectfully, I don't think that we needed to include the law because you have defended the lead of the entire department saying he understood that that's exactly what they were asking for. But maybe the actual law, the regulations, will tell them why. So we know that the jury was told that he knew what they were asking for. But wouldn't the regulations themselves or PARC have explained why that was important, why the regulation was important? Possibly, Your Honor. I can't say because also defendants' witness, New Garcia, who was in charge of audits and so forth, also testified that these are important regulations. There was multiple witnesses testifying about the issue. And respectfully, in hindsight, could I have introduced the specific versions of the law? Certainly.  I'm just corroborating the fact that this is a requirement. So you're saying that the testimony of someone like Marcia Nelson, that 806 required HESPIR to notify the public about the plumb-pump issue, was sufficient to establish a clearly mandated public policy? Well, I'm saying that, but I'm saying the fact that defendants' witness, Mr. Dubois, testified that he understood that that was being requested. Well, it was to notify FDA, not the public, correct? Right. But the FDA is the public body that notified. So the public jury sometimes doesn't understand the difference between the FDA and the public and that the documents are not publicly put out, are they? Yes, sometimes they are. So one of the things that came out in the testimony is that there is such a thing as a customer notification, and that is to the public. So that's warning the hospitals, yes, this pump is safe for use in adults, but you should not use it on infants and children. And I also correctly noted that this hospital said to HESPIR we are not using this pump. We saw the dangers. Luckily, nurses were there. We stopped them, but we're not going to use this pump anymore. Was there a CAFA call for the plumb-pump issue, to your knowledge? Because it looks like they're pretty anxious to call them. The last one they wanted to call was an investigation about the investigation. Yes, they had the CAFA investigation about the investigation. It might have been a CAFA that was a few years old that never got resolved, but there was never – because they're saying that there was consensus that this pump was not dangerous. I mean, there was a lot of – All right, how do they get to a consensus if there is no formal investigation called? I guess that's my question, not familiar with industry. If they're worried about the sympathy, can they call the CAFA? They're given information about this one. How do they initiate this investigation? It sounds like to me, by reading what I read, it was by a CAFA. I did not see a CAFA call for this one. They did have a CAFA. It was long before. We never got any information on it, other than they said, we did notify the FDA of the hospital complaints, but not of what was found to be the real issue, that the pump shouldn't be used on infants. Well, Mr. Ostrowski, the email, and I think Mr. Eden commented on this, it really dealt more with the process, the hospitals not getting a response, and that's what his email was all about, wasn't it? Well, Mr. DuBois testified he understood that the email really meant we should be warning the hospital because a communication to the hospital would have been, we're updating our instructions for you. And Mr. DuBois testified, and I think Ms. Garcia also testified, that these employees received training on what to put in email. So I think the key is that Husker understood what was being reported. Well, but there were really five different emails that were sent, all about communication. Isn't that correct? And not once was there any mention even, forget about the word recall, safety. There wasn't a mention of a safety issue, let alone recall, in the five, quote, protected reports back in August of 2011, and I guess up to the last one, September 26th, 2011. Respectfully, Your Honor, there was notice of the recall. I have forwarded to Mr. DuBois the research that Ms. Mousley conducted, and it specifically said we really, we can't keep going back and investigating this because we know it's a problem and there needs to be a recall or a customer warning. Your client, your client's email? My client emailed that to Mr. DuBois. The report? He emailed the report, yes. So you're saying that was part of what was complained of? That was one of the five. That was the second to the last report. The final report, we think what really caused the termination is that he also notified the CEO. And Mr. DuBois testified that the next day is when he decided Angel should be fired for this supposed, quote, chronic violation. And that was after a very separate, lengthy investigative process by a physician of the company. No, Your Honor. Oh, right, the ethics. I'm sorry, there are two investigations. One by the ethics department. We don't know how lengthy that was because the investigator shredded all notes from that investigation. But we know numbers of people were interviewed, correct? Yes, but we know that the quality department conducted an investigation after Angel was terminated that found that Angel and Marcia's actions were consistent with the quality department's rules, which the number one rule in the code of business conduct was to follow your department's policy, which leads me to the defamation, per se. This company not only terminated Nelson on retaliation for his report, but it made two defamatory, per se, announcements about his termination. Well, let's take the one heads will roll first. When he mentioned, Mr. Dubois mentioned that Marcia Nelson was terminated, and that, although he denied specifically using those words, but anyway, more heads will roll. Plaintiff's name was not mentioned in that statement. And in fact, I think the record reflects plaintiff testified that he had no idea that he would even be included in that statement. So how was this statement harmful to plaintiff on its face? Well, plaintiff would have no reason to know that he would be impacted because he didn't violate the code of conduct. Mr. Dubois made an announcement to, on his direct report, that Ms. Nelson had been terminated for an ethics violation in connection with an audit. More heads will roll. The NSAI audit for a different pump, correct? Yes. And Mr. Estrada was responsible for what aspect of that? Mr. Estrada managed Ms. Nelson. Right. And Ms. Nelson, in the report, is it the report to the FDA to remove some documents? No. I'm sorry. It gets a little confusing. So she was involved in an investigation into the Simbique pump issue. The engineer had falsely stated that they had found the root cause. She had spoken to this engineer and said, no, this does not make sense. And in fact, long after this, it was found that they did not find the root cause and there was still a lot of dangers with the Simbique pump. So she told him, you need to fix this. We can't say false information in these investigations. And then this NSAI audit is happening, which is a paid audit by ACERA, and the auditor asks for this investigation. And Ms. Nelson and the subject matter experts see this and say, this is wrong. We can't stand behind this. We can't defend this. We can't put this in there. So Ms. Nelson called the engineer and he agreed she could remove it. The engineer was then later threatened that if he signed off on that removal, his job would be at risk. That testimony came out during the trial. So it gets to be a bit complicated, but the announcing that a respected quality and compliance professional was going to be terminated in connection with an audit is clearly defamatory on its face. Mr. O'Shaughnessy's only other termination that happened was the Moore-Hensel role. Well, but don't we need extrinsic facts, that is, facts outside those statements, to construct a defamatory meaning? Not really. I mean, I want to say that this is – What? How are they not? Go ahead. Okay. Well, first, the Supreme Court of Illinois held this right, that courts do have to interpret allegedly defamatory words as they appear to have been used and according to the idea they were intended to convey. Mr. DuBois testified he intended to convey that these employees were terminated for an ethics violation. But they have to be on their face defamatory, right? Well, the Moore-Hensel role, you know, the – What I want to say is that to a case and a record case, is that in Illinois the defamation, per se, issue is a mirage. Defendant's defamation is very consistent with the vast majority of precedents in Illinois. In LeSean, the 1st District held that the word cause was defamatory, even though it really had to look at the party's contractual definition to determine the per se defamatory meaning. In Tuitt, the Supreme Court of Illinois held that statements about a receipt of a 1 million-dollar retainer were defamatory per se because of the context of the publication, because they were written in a book that was non-mafiatized. And don't we also look at the fact that the plaintiff was terminated one day after the statement was made, and isn't that an extrinsic fact? That's a fact that, Your Honor, I get. I mean, you can say that's an extrinsic fact, but in this court – Well, it's outside the statement. So, I mean, it's facts that you need to know besides what is in the statement itself. Well, this court found in the Hadley v. Sandusky case that saying – I'm sorry, the Hadley case, but saying Hadley is a Sandusky was defamatory on its statement. That was not the statement. The statement was he's a Sandusky waiting to be exposed, which is calling him a child molester on his face. And there was broad public media attention to that, so the facts of that case are very different than the facts here. But my point is that there was broad media coverage that the court had to look to to determine the defamatory meaning. It's not defamatory on its statement. It wasn't. It was innocent, so it couldn't be construed as something definitive. But, see, and that's my problem with using Bryson. Nobody here has argued that this is an innocent construction case. No, it's not. And that's what Bryson was. So I don't know how Bryson even fits here. I think the defendant did argue that it's an innocent construction case. Well, I mean, maybe in a little tiny phrase, but there's no real argument in authority that's cited for that. Right, but the fact is here the jury was instructed that if it found that either statement was defamatory on its statement, it was fine for on-held. And essentially, the defendant in its brief admits that the jury brought a second announcement, wasn't defamatory per se, if, as the jury found, that on-held was required in retaliation for demanding that Hasbiro warn the public about its funds. The problem is that's not consistent with the testimony. Mr. Dubois testified that on-held did everything that Mr. Dubois requested of him in response to this audit issue. He opened the investigation. He reported things to Mr. Dubois. And, in fact, he did everything Mr. Dubois said he himself would do. So even if there was no retaliatory discharge, the statement is still defamatory per se. And the allegations, I know that the counsel is trying to say that allegations in paragraph 63 of the complaint aren't just broad. They actually identified the exact same date the statement was made, the same audience to whom it was made, and essentially the same statement. The defendant got notice of this months before the trial. So the plaintiff knew a year before from the deposition that this statement was out there. Right. The only amendment would have been instead of saying Hasbiro said this, that Mr. Dubois said this. Both parties were well unnoticed. And the lead standard is the applicable standard. There's no prejudice. This is not something that caught them off guard here. Except that you didn't make the motion until the evidence was closed. So you had opportunities earlier during the trial, perhaps even after Dubois testified. And the motion to amend the complaint was not made until the very end. So how could that not be prejudicial? Well, the motion, there was a motion to amend that was made before trial. After Mr. Dubois testified during the trial? No, no. Yes, and after he testified at trial. To eventually conform the claim to the proof? Yes. That was after Mr. Dubois testified? That was at the close of the trial. Right, at the close. But he testified that he made the statement earlier. During his testimony, he testified to the exact words of that statement. Correct? Correct. Okay. In fact, he made it in your case in chief when he was an adversary. Right. And so that, why wasn't the motion made then? I don't, I mean. Because he had given them an opportunity to respond. Right, but they are saying that they weren't able to prepare a qualified privilege defense assuming the statement had the same meaning. Dubois has a role statement and a second statement. They were promulgating repeated announcements that this person was terminated for an ethics violation. If they wanted to put on a qualified privilege defense, they had the opportunity regardless of whether that statement was included. And in fact, they waived it. But why would they do it if that statement, I mean, if they relied, to their detriment unfortunately, if they relied on the judge's ruling that it wasn't going to commit for that purpose, then why would they develop a qualified privilege defense? Because the first statement was also, it was the same statement. They repeatedly announced that he was being terminated for an ethics violation. He never mentioned his name the first time. In Morehead's role, his name never came up. No, but he's the only other person. I mean, there were other direct reports that could have been. They could have taken out the whole division. Why not? But they only did take out one. And I mean, nobody's going to announce we're going to terminate Angel tomorrow for an ethics violation. It's just that we're looking at whether the statement is discriminatory or not. And if we're looking to other, again, extrinsic facts, then it's not defamatory on its face. It's a strange reading, though, because most of the cases do look to extrinsic facts. I mean, to say that you're fired for cause, is that defamatory on its face? No, it's defamatory because of the contractual definition of the word cause. That's an extrinsic fact. When did Mr. Estrada finally realize that he was discharged for the plump-pump issue? He didn't realize he was discharged for the plump-pump issue until months later because his wife went and got his personnel file, and that's when it said that. He had no idea. Oh, no, I'm sorry. The plump-pump. I thought you were talking about this audit. He had no idea he was terminated for the audit. He thought, I mean, really, I think he was in shock at first. He didn't know why he was fired. You're saying he did not know when he was fired that he was fired for the audit? No, he wasn't told that. He was told that he was having a lack of leadership. And just the day before, Mr. DuBois had sent him an email, this is the type of leadership that we want you to be having, about another issue he brought to their attention. So he pieced together the information in his own mind? Yes, he pieced it together, yes. He connected the dots. May I read my age across with you? Yes, briefly. Okay, thank you. So there was commensurate damages awarded or punitive damages awarded here. For the defamation per se, there's one component of compensatory, which is presumed damages and two for retaliatory discharge, emotional and economic. For the presumed damages, respectfully, the trial court erred and eliminated the meaning of presumed damages. And presumed damages are general damages which don't need to be proven. And, in fact, we believe that the trial court did not hold this court's ruling in white bread versus consolidated grain. The jury should have been presumed to understand this instruction. The jury was given very different instructions for defamation per se damages and for retaliatory discharge damages. Retaliatory discharge damages were emotional and economic. Defamation per se were presumed, which they could consider things like mental distress and damage to reputation. Counterargent defendants argued these damages flow from different firms. Most companies don't terminate somebody in retaliation for an issue and then go and denigrate that person's reputation. And, in fact, there's no precedent in Illinois to support their claim that presumed damages can be duplicative of any proven damages. Well, what are the separate and distinct injuries here? Wasn't there one injury? And what was the separate evidence introduced? The evidence for the defamation per se is very similar to the evidence that was provided in the LeSean case. He testified that friends in the industry wouldn't return his calls. Recruiters stopped calling him. His wife testified that a stranger approached her in the gym and said, I heard your husband was fired for breaking the law. Those all come from reputational damage. And the jury clearly understood that these things are different because the amounts awarded are very drastically different. $750,000 for presumed damages, $2 million for emotional, and $230,000 for economic. Isn't there really a double recovery here regarding the compensatory damages? No, Your Honor. There is not a double recovery. As I said, the evidence for the defamation per se is very similar to the LeSean case. And the evidence for the emotional damages is very similar to that presented in the Drakeford v. University of Chicago case. That case upheld a $3 million emotional distress award for an unauthorized burial, and it relied on faith testimony. She was horrified and depressed and sought care for depression. Othell testified he thought his life was worth more dead than alive. His wife testified that the next day she found him, or in the middle of the night, she found him crying on the kitchen floor. He wasn't able to care for himself. He wasn't able to shave or bathe for months. He did get better after a month because she forced him to seek medical care and go on medication for depression. Why are punitive damages warranted for either claim when the husband did not engage in a pattern of misconduct against plaintiffs And his discharge came at the end of, I think the record shows, about a month-long investigation by this separate ethics department at Health Bureau. His discharge came two days after he sent that email to Mr. DuBois and Mr. Ball. And there had been an investigation that had been opened up prior to that, right after the NSA audit, and all that came to light. And this was the record. Mr. Othell was mentioned once in the investigation, and it doesn't mention any wrongdoing on his part, other than I think it said he said, thank you. That was the only mention of Othell in the entire investigation report. So to say that he was fired after a lengthy investigation, Okay, forget if it's lengthy or short. The point is, why are punitive damages warranted for either claim here? Well, for the defamation per se, because the company made multiple announcements. It intentionally denigrated the professional's reputation. I mean, it did so to cover up its own wrongdoing. Moreover, defendants... What are the criteria that are to be used? What are the criteria that are to be used? Well, for defamation per se, malice is supposed to be imputed to defamatory per se statements, other than they only be adding that standard. I do understand that defendants ask the court to ignore that standard without citing any authority. The standard is that the behavior was willful and wanted. The company promulgated a lie to discredit a respected quality and compliance professional. That's malicious. That's why the jury responded so harshly to this defamation. The jury reacted strongly to a company lying to discredit an employee. Everything you've just said really doesn't go beyond the proofs. The proofs. What other evidence besides the elements of the defamation per se justify punitive damages? Well, it's the maliciousness of the conduct. I mean, it's the fact that it was multiple... They didn't make it to just one group of people in the direct report. They made it to multiple groups of people. Well, are you basically saying that if there is a defamation per se, notwithstanding the evidence, it is there should be punitive damages because malice is imputed? Is that... Are you going to disregard the evidence and say, okay, that was very malicious, but we've got to look at the evidence to find out if it was malicious? No. I am saying that that is the standard, but I'm saying that in this case, the conduct ran well above just a normal defamation per se. I mean, this was... There was an intent. In fact, Mr. DuBois testified that they intended to make an example out of on-hill, and that's why they were making these multiple announcements. And the example was, don't come and raise your hand and say that there's problems with the product. Really, they took a calculated risk here. What's more expensive, a recall or a judgment? What you're saying is that they're behind the scenes, they're telling coworkers that he was really fired because of the plum pump? Is that what you're saying? No, no, I'm not saying that. Okay. Sorry. No, I'm saying that they're really telling coworkers, hey, we fired this guy because he committed an ethics violation. And I think that's consistent with the LeSean Award of punitive damages, which is $6 million. And the only statement was made to a limited audience, an HR employee, and that was, you're fired for cause. This was a limited group of people too, was it not? The second item was a group of six people, not one person like in LeSean, and the first group was a larger group because it was all the direct reports and reports. And for a company the size of Hasbira, a company that recently sold for over $16 billion and paid out its CEO over $90 million in connection with that sale, $5 million is insignificant in terms of serving as a punishment or a deterrent. And if you look at the question of due process, at first it has to be reprehensible, which means there has to be some physical harm, which the court found is evident from him having to go on medication. And it has to be intentional. It can't be a mistake. Here it was clearly intentional. They testified it was intentional. And the 6.67 to 1 ratio was well within due process limitations. The U.S. Supreme Court held in Campbell v. State Farm, a ratio of 145 to 1 was too high. That case ultimately ended up with a $9 million punitive award, which is a 9 to 1 ratio. So 6.67 to 1 falls within due process limitations. And there's no authority cited by the Senate. There's no authority out there that holds otherwise. Similarly, the retaliatory discharge was also malicious and willful and warranted Hasbira fired Onhill to avoid a public disclosure about a known risk to farm. Again, I'm going to point out, Mr. DuBois testified that this company knew that Onhill and others wanted Hasbira to notify the FDA or at least update instructions for youth not to use this phone point instance in children. But he didn't want to do so because no injury had occurred yet. That's not the standard under the regulation. The regulation is if you know that there's a risk, you don't wait for an injury. You report that to the FDA. You update your instructions for youth. That's malicious. And, you know, in terms of the due process argument, there is no unauthorized retaliatory discharge. The ratio is less than 1 to 1. And for all the reasons I stated, the conduct is clearly reprehensible. Thank you. Do you have anything else? Thank you. Before I address the damages issue, because I do want to get into that, let me talk about a few other issues that came up through your questions. First of all, at the end of this investigation with respect to the Symbia pump, on September 26th, there was a meeting with DuBois that was uncontroverted in the testimony between Frank Tabor and Christine Brown. They recommended to Mr. DuBois that Mr. Ashado be terminated. On that same day was the e-mail that was sent to Mr. DuBois that he was not aware of it on September 26th. It was just at that time. That e-mail addressed an issue relating to the process. Your Honor, I'm aware of the testimony that said that if there's going to be a recall, you don't put that in the e-mail, but that's when you're talking about complaints about the product itself. It was limited to that. It was not talking about complaints relating to the process of filing the complaint and responding to it, which was purely an aspirin issue. Counsel mentioned several times what the regulations require. Well, unfortunately, other than counsel's testimony here, I'm sorry, argument, we have no evidence in this record other than a reference by Ms. Nelson and a reference by Ms. Rapp as to what 806 provides. There was no, it wasn't presented to the jury. We have no evidence to anticipate as to what's required and what isn't required. Counsel says it applies to recall. I respectfully disagree, but unfortunately we don't have any testimony to base that on. What we do know is that there were reports made. What we do know is that there's some disagreements as to what should be in the reports. Also, on his parole, counsel kept saying, well, we can only refer to Estrada. No, Mark Jones, he was terminated also. He was another employee that we could have referred to. There were six direct reports to Estrada that it could have applied to. And I think what is compelling, and I'm not sure which of you mentioned it, but Estrada was asked at trial, do you think that meant you? I don't know. So it seems to me without extrinsic evidence as to what happened the next day, he didn't even know that the heads of parole referred to him, and that was a highly prejudicial allegation that was jury instructed on that was defamatory per se, which was a legal issue, and it simply was not because it relied upon extrinsic evidence. So we respectfully submit that that was error. With respect to damages in this court, Justice Seneff, I know you brought it up a couple times. There was no evidence here that this was separate and distinct injuries. The evidence was fairly scant. It was from Mrs. Estrada and Mr. Estrada that he lost his sleep, I had to see a doctor, he did have this episode in the kitchen, but he didn't say, and maybe he could, that it was because they fired him or that it was because of the defamation. It was never linked, and Judge Ortiz got that part right with respect to this was the single incident. Without the retaliatory discharge. Well, it's a pretty big one. I mean, getting fired from a job of this nature for any reason is going to be a significant issue. I couldn't agree more. But what it seems to me, if you have two different counts, and one of the cases I really dealt with this issue, when you have two different accounts, two different counts, that you have to show that there was some distinction between the two. And what Judge Ortiz said was, yes, we had evidence that there was emotional distress. Did we have evidence that emotional distress on this particular day was due to defamation or emotional distress on this particular day was due to retaliatory discharge? And what he said was, this arose out of a single injury, and I'm not mitigating the consequences of being fired. Lord knows I wouldn't want that to happen to me. But it seems to me that we have a double recovery, which is what happened here. Two million in emotional distress on the retaliatory discharge. 750,000 for whom damages is the original verdict. There was tremendous overlap when the judge was trying to deal with that issue. Well, I think we just heard, though, and I'm assuming she said that counsel said that to the evidence. She didn't realize everything until later. The fact that he puts, as Justice Burkett said, connects the dots later, doesn't that create separate situations? It may be the same firing, but now we have this situation that is identified internally, maybe six to seven months later, two to three months later, whereas the discharge happened today. Doesn't that create separate? We have the same two counts, but we have separate times. Under some circumstances, yes. Under these circumstances, no. Why not? Because his testimony never related to – first of all, within five days of being terminated, he is out on jobs. Within two months, he's doing consulting work. He's also applying to get a PhD. He has a job within six months. So during this period of time, there was no, like, I was upset for this reason because I found out two weeks later that I was being defamed. He knew the day he was discharged what Dubois and Estrada both said. When he was discharged, he was told that his lack of leadership came with the audit. And he wasn't informed at that point as to the CBOC. He said that came later. But there was no direct relationship between his response to one particular count or the other. The judge found that as growing from the same grouping. Because, as I said earlier, without the retaliatory discharge, there would have been no defamation because it would have been truthful. So it arose out of one count. And so there was no effort by the plaintiff to make separate and distinct evidence that related to the injury. But there is one additional element with respect to the defamation per se. Presumed damages that have damaged reputation that isn't included in the retaliatory discharge compensatory damages. You're absolutely right. And Judge Ortiz said, and I believe when he lowered the amount to 520, he distinguished the loss of reputation in 175 and in 365, and I have my math right, on the emotional distress. So he recognized that and he added that additional element of damage into his claim. And then moving from compensatory to punitive. Justice Paquette, I think your question goes to the heart of it. What evidence was there that this was only involved with needed to be proved for the underlying counts? And there was no evidence presented. There was evidence that they said they presented to prove retaliatory discharge. There was evidence for the defamation per se, they alleged. We obviously disagree with that. But even if that were true, what conduct here was over and above? And there's two types of punitive damages, as this Court is aware, when you do the analysis. There's the Illinois Common Law and the due process of the United States Constitution. With respect to Illinois Common Law, what the Supreme Court has said, that conduct must evince a high degree of moral culpability. That simply was not here. Even if you believe that. How do you prove that? Circumstantially? Directly? I mean, how do you get there? Well, first of all, I think the legal issue as to whether or not the jury should even be instructed. So, to answer your question, the judge is going to have to determine whether or not, is there enough evidence here to submit this on penalties? We believe, and I think the standard is, that he, as a matter of law, because that's a de novo review, it's on abuse of discretion. We're not dealing with that. We're not sending this to the jury. Because this is a one-time event. This is a single incident. It was a second defamation. Counsel is practically wrong about the number of people. In both meetings, there were six people. That was the evidence. There were his direct reports in the second, and there were six people in the first. So, we're talking about a very narrow group of people, and these are all factors that the Illinois courts have looked at in determining. This is not a situation where, having Brian Williamson assume Walter Jacobson, put something on this television program. This is not a situation where there's been an article written. This is a situation where Hospiro did what they thought they needed to do, which was to have a meeting and talk to their employees about what had happened. But at the time, Hospiro was an international company. Yes. And these six people were here, and they saw what happened, and these six supervisors, these six executives were here, and they saw what happened for what was called a lack of leadership. Yes. That stayed within those 12 people? Realistically? I have an office of four people, and I can't tell a secret. You know, it just moves. I understand the point. I get it. Their intent was that, I mean, we can't say anything about gossip. I mean, they had a town hall meeting, which was like the next day. It was not said there. There was no mention of that. They could have perhaps said, well, we've heard a lot about what's going on here today, and the shot was fired for violating the code of conduct. They didn't do that. Gossip aside, they tried to do what they thought was right, and they tried to follow the law, and this is not an instance where there was a string of conduct that was targeting him to get rid of him. Counsel said something that was really kind of igniting, that in her mind, you know, Dubois decided, and maybe he could do that by himself, but I don't know, Dubois decided that a lawsuit was cheaper than a recall. Are you saying that can't be assumed or presumed from this set of facts? There's nothing in that evidence? Absolutely not. Mr. Dubois testified, and it's on page five of our statement of facts in our brief. It gives you the exact citation. That 30 people looked at the September 12th report that they submitted to the SBA, and there was a consensus that this product could be used. It's acceptable with justification. He at no time said we're going to try to bury this because it should be a recall. He relied upon the people who he should rely upon to make that determination, and those are the facts. I believe it's, again, perhaps it's exhibited 13 and 33, one or the other. So, no, Your Honor, there's just no basis to make that assumption. So we respectfully ask that this Court, first of all, reverse on the issue of retaliatory discharge because there is no clearly mandated public policy, and if you do that, then the defamation claims fall. If you uphold the counts, then we would ask that the compensatory damages be reduced because there is insufficient evidence to prove up the amounts with respect to loss of reputation and emotional distress. And, Your Honor, respectfully, at the very least, even if you affirm that the compensatory has been reduced by the trial judge, there's no basis for the damages here. It never should have gone to the jury, and that's a legal issue. Thank you. One last question. Is there any, in your mind, with any of those scenarios you've identified, is there any reason for a remand in this case? No. Okay. Thank you. Thank you. We all know the most valuable asset a professional has is his or her reputation. Contrary to some arguments, it would strip him from the record, but there was testimony that Mr. Duvall made the announcement also at a council meeting, but since he's alleging that it wasn't made, I just want to correct that. There's also testimony at trial that a recall would have, quote, crippled the company. It's very easy to believe that the company decided a recall. Did Duvall say that? No, no, no. I want to testify that a recall would have. They got training on the cost of a recall. The company, and Mr. Duvall did testify that the company did provide training from the financial department about when a recall would be booked. Basically, the defendant argued that this case, that the compensatory damages are too high. In the LeSean case, being terminated for cause was enough to establish $2 million in presumed damages and $6 million in punitive damages. The harm here is far greater. This company, again, repeatedly tried to discredit this professional. In his testimony, did Mr. Estrada identify the companies or the people that he reached out to to try to get hired? Yes. He had applied to over 20 companies in the local area, and it is true he did mitigate the damages and took a job that had been open for 18 months. It was next to a factory cited for repeated EPA violations, and he moved his high school-age kids out of state. This is where his family wanted to have his kids graduate. This is where the state wanted to live. That's why he took this job and moved them to Chicago. That's what the testimony. And he had also moved three other times prior to that, correct? Moved his family for other jobs? Yes, prior to the kids being in high school, he did. But he testified and his wife testified that they specifically wanted to settle down in Chicago, that they saw out working in the area because of that. And to date, I have to say, he has been blackballed from the industry in the U.S. He no longer works in the U.S. That's not part of the record. No, that's not part of the record. And the jury heard evidence for over five days and determined the appropriate award of damages. Damages are a question uniquely left to a jury. Our entire justice system is built around the idea that a jury of our peers will determine the appropriate damages. And especially for presumed damages, which don't require proof and are very nebulous, it's up to the jury to determine what's the appropriate award. And the trial court judge did err because the trial court said he presumed that the jury included emotional and compensatory in the presumed award. So he eliminated the compensatory and emotional damages completely and said they must have included those in there. That's a presumption that the jury doesn't understand its instructions and its culture. But they followed the instructions that were given. Isn't that correct? Right. Right. And the jury should have presumed. Sorry, the trial court should have presumed that and followed this court's ruling in white bread, which said I think that case is still on point because this court found that emotional distress damages and emotional harm were two separate and distinct injuries. I don't even sound alike. And the jury, in fact, in that case, for two of the plaintiffs, awarded the exact same amount for these two sets of damages. Here the jury understood presumed damages are a separate category of damages. In the verdict form they were given a list. Here's the defamation per se, presumed damages. Here's retaliatory discharge, economic, and emotional. And that was an error by the court to just presume that the jury didn't understand what it was doing when it made those determinations. If we were to decide, if we were to agree with Huspera that this was not the two allegations, the statements were not defamation per se, what should we do with regard to the award? I don't believe the court will determine that. I'm just asking you, what relief would you ask in that circumstance? I'd ask that the court restore the emotional, excuse me, the retaliatory discharge damages in their entirety, the compensatory and punitive. But I do want to say that Huspera admits the second statement was defamatory per se, as long as he was terminated in retaliation for his report. So I think, and the jury was instructed, if it found either statement was defamatory per se, it was fine for us. Thank you, Your Honor. And I need to ask you the same question. Is there anything that we could do or wouldn't do that you could see would need a remand? I believe if you ordered the trial court to reinstate the damages, that would be a remand for them to reinstate the damages. I mean, that's a technical one, but anything, any other remand? No, Your Honor. All right. Thank you. All right. Thank you, counsel, for your argument this morning and for your briefing in the past. We will take the matter under advisement and we will issue a decision in due course. We will now stand adjourned.